# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 19, 2012          Decided March 1, 2013

No. 11-5219

IN RE: POLAR BEAR ENDANGERED SPECIES ACT LISTING AND
SECTION 4(d) RULE LITIGATION – MDL NO. 1993,

SAFARI CLUB INTERNATIONAL, ET AL.,
APPELLANTS

v.

KENNETH LEE SALAZAR, ET AL.,
APPELLEES

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
INTERVENORS-APPELLEES

---

Consolidated with 11-5221, 11-5222, 11-5223

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-mc-00764)

---

*Murray D. Feldman* argued the cause for appellants. With him on the briefs were *Bradley E. Meyen*, Assistant Attorney General, Office of the Attorney General for the State of Alaska, *John J. Jackson III, Douglas S. Burdin, Anna M. Seidman*, *M. Reed Hopper*, *Theodore Hadzi-Antich*, *Damien*

*S. Schiff*, *Marcy G. Glenn*, and *Christina F. Gomez. Craig D. Galli* entered an appearance.

*Murray D. Feldman* and *Bradley E. Meyen* were on the brief for appellant State of Alaska.

*Steven J. Lechner* was on the brief for *amicus curiae* Mountain States Legal Foundation in support of joint appellants.

*Katherine W. Hazard*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Meredith Flax* and *David C. Shilton*, Attorneys.

*Rebecca J. Riley*, *Brendan Cummings*, *Kassia Siegel*, *Jason Rylander*, and *Howard M. Crystal* were on the brief for intervenor-appellees Center for Biological Diversity, et al. *Eric R. Glitzenstein* and *Benjamin H. Longstreth* entered appearances.

Before: GARLAND, *Chief Judge*, BROWN, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

EDWARDS, *Senior Circuit Judge*: In 2005, the Center for Biological Diversity petitioned the Secretary of the Interior and the Fish and Wildlife Service ("FWS" or "agency") to list the polar bear under the Endangered Species Act ("ESA" or "Act"). When a species such as the polar bear is listed as either "threatened" or "endangered" under the Act, it is then subject to a host of protective measures designed to conserve the species. After a three-year rulemaking process, FWS found that, due to the effects of global climate change, the polar bear is likely to become an endangered species and face the threat of extinction within the foreseeable future. *See generally* Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range ("Listing Rule"), 73 Fed. Reg. 28,212 (May 15, 2008). The agency thus

concluded that the polar bear should be listed as a threatened species. *Id.*

A number of industry groups, environmental organizations, and states challenged the Listing Rule as either overly restrictive or insufficiently protective of the polar bear. These challenges were consolidated as a Multidistrict Litigation case in the U.S. District Court for the District of Columbia. After a hearing on the parties' submissions, the District Court granted summary judgment to FWS and rejected all challenges to the Listing Rule. *See generally In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation*, 794 F. Supp. 2d 65 (D.D.C. 2011). Joint Appellants filed a timely appeal to contest the District Court's judgment. They contend that the Listing Rule is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and that FWS's action should be reversed because of a series of deficiencies in the rulemaking process and the Listing Rule itself.

The appellate court's task in a case such as this is a "narrow" one. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Our principal responsibility here is to determine, in light of the record considered by the agency, whether the Listing Rule is a product of reasoned decisionmaking. It is significant that Appellants have neither pointed to mistakes in the agency's reasoning nor adduced any data or studies that the agency overlooked. In addition, Appellants challenge neither the agency's findings on climate science nor on polar bear biology. Rather, the principal claim advanced by Appellants is that FWS misinterpreted and misapplied the record before it. We disagree.

In rejecting this appeal, we are guided by the Supreme Court's admonition that "a court is not to substitute its judgment for that of the agency," *id.*, particularly in cases

where the issues "require[] a high level of technical expertise," *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989). Given these considerations and the evident thoroughness and care of FWS's explanation for its decision, we can only conclude, as did the District Court, that Appellants' challenges "amount to nothing more than competing views about policy and science." *In re Polar Bear*, 794 F. Supp. 2d at 69. Accordingly, we affirm the judgment of the District Court.

## I. Background

The District Court's opinion contains an extensive summary of the factual and procedural record, *see id.* at 71-79, so it is unnecessary for us to recite all of that information here. Instead, we offer the following background statement for convenience and clarity.

## A. The Endangered Species Act

Congress passed the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). "The term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range . . . ." *Id.* § 1532(6). "The term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The Secretaries of Interior and Commerce are obligated to publish and maintain a list of all species determined to be endangered or threatened. *Id.* § 1533(c)(1). The Secretaries have

delegated this authority to FWS and the National Marine Fisheries Service, depending on the species at issue. 50 C.F.R. § 402.01(b).

The ESA empowers an "interested person" to petition the appropriate agency for the listing of any species. 16 U.S.C. § 1533(b)(3)(A). Upon receiving such a petition, the agency "determine[s] whether [the] species is an endangered species or a threatened species because of *any* of the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* § 1533(a)(1) (emphasis added). The agency makes a listing determination "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation . . . to protect such species." *Id.* § 1533(b)(1)(A).

## B.   The Listing Rule

On February 16, 2005, the Center for Biological Diversity petitioned the Secretary of the Interior to list the polar bear as threatened under the ESA because of the effects of global climate change on polar bear habitat. *In re Polar Bear*, 794 F. Supp. 2d at 72. On December 21, 2006, following peer review and multiple opportunities for public comment, FWS completed a 262-page Status Review. *See generally* SCOTT SCHLIEBE ET AL., RANGE-WIDE STATUS REVIEW OF THE POLAR BEAR (*URSUS MARITIMIS*) (Dec. 21, 2006). (The Status Review is posted on FWS's website at http://www.fws.gov/.) Shortly thereafter, on

January 9, 2007, FWS published a proposed rule to list the species as threatened; this action triggered a 90-day public comment period. *See generally* 12-Month Petition Finding and Proposed Rule to List the Polar Bear (Ursus maritimus) as Threatened Throughout Its Range, 72 Fed. Reg. 1064 (Jan. 9, 2007).

During the course of the rulemaking process, FWS sought the assistance of the U.S. Geological Survey ("USGS") in "collecting and analyzing scientific data and developing models and interpretations that would enhance the base of scientific data for [FWS's] use in developing the final decision." Listing Rule, 73 Fed. Reg. at 28,235. USGS produced "nine scientific reports that analyze and integrate a series of studies on polar bear population dynamics, range-wide habitat use, and changing sea ice conditions in the Arctic." *Id.* These reports were also subject to public comment.

FWS published the final Listing Rule on May 15, 2008. The Listing Rule concludes that "the polar bear is likely to become an endangered species within the foreseeable future throughout all of its range" and should therefore be listed as threatened. *Id.* at 28,212.

The Listing Rule explains in detail the taxonomy, evolution, and population of the species. Some of the principal findings are as follows:

> Polar bears evolved in sea ice habitats and as a result are evolutionarily adapted to this habitat.

> \* \* \* \*

> Over most of their range, polar bears remain on the sea ice year-round or spend only short periods on land. However, some polar bear populations occur in

seasonally ice-free environs and use land habitats for varying portions of the year.

* * * *

Although polar bears are generally limited to areas where the sea is ice-covered for much of the year, they are not evenly distributed throughout their range on sea ice. They show a preference for certain sea ice characteristics, concentrations, and specific sea ice features. Sea-ice habitat quality varies temporally as well as geographically. Polar bears show a preference for sea ice located over and near the continental shelf, likely due to higher biological productivity in these areas and greater accessibility to prey in near-shore shear zones and polynyas (areas of open sea surrounded by ice) compared to deep-water regions in the central polar basin. Bears are most abundant near the shore in shallow-water areas, and also in other areas where currents and ocean upwelling increase marine productivity and serve to keep the ice cover from becoming too consolidated in winter.

* * * *

Polar bears are distributed throughout the ice-covered waters of the circumpolar Arctic, and rely on sea ice as their primary habitat. Polar bears depend on sea ice for a number of purposes, including as a platform from which to hunt and feed upon seals; as habitat on which to seek mates and breed; as a platform to move to terrestrial maternity denning areas, and sometimes for maternity denning; and as a substrate on which to make long-distance movements.

* * * *

The total number of polar bears worldwide is estimated to be 20,000-25,000. Polar bears are not evenly

8

distributed throughout the Arctic, nor do they comprise a single nomadic cosmopolitan population, but rather occur in 19 relatively discrete populations. The use of the term "relatively discrete population" in this context is not intended to equate to the Act's term "distinct population segments." Boundaries of the 19 polar bear populations have evolved over time and are based on intensive study of movement patterns, tag returns from harvested animals, and, to a lesser degree, genetic analysis. The scientific studies regarding population bounds began in the early 1970s and continue today. [The Listing Rule adopts] the use of the term "population" to describe polar bear management units consistent with their designation by the World Conservation Union-International Union for Conservation of Nature and Natural Resources (IUCN), Species Survival Commission (SSC) Polar Bear Specialist Group (PBSG) with information available as of October 2006, and to describe a combination of two or more of these populations into "ecoregions." . . . Although movements of individual polar bears overlap extensively, telemetry studies demonstrate spatial segregation among groups or stocks of polar bears in different regions of their circumpolar range. These patterns, along with information obtained from survey and reconnaissance, marking and tagging studies, and traditional knowledge, have resulted in recognition of 19 relatively discrete polar bear populations. Genetic analysis reinforces the boundaries between some designated populations while confirming the existence of overlap and mixing among others.

*Id.* at 28,212-15 (citations omitted).

The Listing Rule also explains that studies of the nineteen polar bear populations have divided the species into four "physiographically different functional groups or 'ecoregions'

in order to forecast future polar bear population status on the basis of current knowledge of polar bear populations, their relationships to sea ice habitat, and predicted changes in sea ice and other environmental variables." *Id.* at 28,217. The Listing Rule then discusses the Archipelago, Seasonal Ice, Divergent, and Convergent ecoregions in some depth. *Id*. at 28,217-19.

FWS cited three principal considerations in determining that polar bears should be listed as a threatened species. *First*, the polar bear depends on sea ice for its survival. *Id*. at 28,214. *Second*, sea ice is declining. On this point, the Listing Rule states:

> Polar bears evolved to utilize the Arctic sea ice niche and are distributed throughout most ice-covered seas of the Northern Hemisphere. We find, based upon the best available scientific and commercial information, that polar bear habitat – principally sea ice – is declining throughout the species' range, that this decline is expected to continue for the foreseeable future, and that this loss threatens the species throughout all of its range. Therefore, we find that the polar bear is likely to become an endangered species within the foreseeable future throughout all of its range.

*Id.* at 28,212. *Third*, climatic changes have and will continue to reduce the extent and quality of Arctic sea ice. *See id.* at 28,244.

FWS concluded that these findings satisfied two of the statutory listing factors: (A) the threatened destruction of the species' habitat or range, *id.* at 28,275-77, and (D) the inadequacy of existing regulatory mechanisms to preserve the species, *id.* at 28,288.

10

In aggregating data on climate change and sea ice, FWS relied on a variety of published studies and reports, including those of the Intergovernmental Panel on Climate Change ("IPCC"). *See id.* at 28,212. FWS explained that

> [t]he rapid retreat of sea ice in the summer and overall diminishing sea ice throughout the year in the Arctic is unequivocal and extensively documented in scientific literature. Further extensive recession of sea ice is projected by the majority of state-of-the-art climate models, with a seasonally ice-free Arctic projected by the middle of the 21st century by many of those models.

*Id.* at 28,292. Noting that sea ice had reached a record low in the summer of 2007, FWS also explained that "[t]he observational record indicates that current summer sea ice losses appear to be about 30 years ahead of the ensemble of modeled values, which suggests that a transition towards a seasonally ice-free Arctic might occur sooner than the models indicate." *Id.* at 28,234.

The agency's assessment of the species' dependence on sea ice derives from peer reviewed studies on polar bear biology and behavior, observed polar bear demographics, and population modeling. As noted above, FWS explained that the bears are highly dependent on sea ice, "including as a platform from which to hunt and feed upon seals; as habitat on which to seek mates and breed; as a platform to move to terrestrial maternity denning areas, and sometimes for maternity denning; and as a substrate on which to make long-distance movements." *Id.* at 28,214. The Listing Rule anticipates that changes to the polar bear's habitat will soon pose an existential threat to the species:

> Productivity, abundance, and availability of ice seals, the polar bear's primary prey base, would be diminished by the projected loss of sea ice, and energetic requirements

of polar bears for movement and obtaining food would increase. Access to traditional denning areas would be affected. In turn, these factors would cause declines in the condition of polar bears from nutritional stress and reduced productivity. As already evidenced in the Western Hudson Bay and Southern Beaufort Sea populations, polar bears would experience reductions in survival and recruitment rates. The eventual effect is that polar bear populations would decline. The rate and magnitude of decline would vary among populations, based on differences in the rate, timing, and magnitude of impacts. However, within the foreseeable future, all populations would be affected, and the species is likely to become in danger of extinction throughout all of its range due to declining sea ice habitat.

*Id.* at 28,292-93.

## C. The District Court's Decision

Soon after publication of the Listing Rule, nearly a dozen challenges were filed to contest FWS's action. *See In re Polar Bear*, 794 F. Supp. 2d at 77-78. Several plaintiffs argued that the listing was unwarranted because the agency failed to establish a foreseeable risk of extinction. Others argued the opposite – that the species should have been listed as endangered because it faced an imminent risk of extinction. These actions were consolidated before the District Court as a Multidistrict Litigation case.

The litigants filed cross-motions for summary judgment. On October 20, 2010, the District Court held an initial hearing on the parties' cross-motions for summary judgment.

At that hearing, the [District] Court focused only on a threshold question: whether it must review the agency's

interpretation of the ESA listing classifications under step one or step two of the familiar framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). In a Memorandum Opinion issued on November 4, 2010, the [District] Court held that FWS had improperly relied on an erroneous plain-meaning reading of the definition of an endangered species that could not be upheld under step one of *Chevron*. *In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation*, 748 F. Supp. 2d 19, 29 (D.D.C. 2010). Finding that the term "endangered species" under the ESA is instead ambiguous, the Court remanded the Listing Rule to the agency "to treat the statutory language as ambiguous." *Id*.

In response to the [District] Court's remand order, on December 22, 2010, the federal defendants submitted the agency's memorandum of supplemental explanation. In their Supplemental Explanation, FWS concluded that, even treating the phrase "in danger of extinction" in the definition of an endangered species as ambiguous, the administrative record does not support a finding that the polar bear qualified for endangered status at the time of listing. Because the agency determined that the species is likely to become endangered within the foreseeable future, however, FWS reiterated that the polar bear met ESA's . . . definition of a threatened species at the time of listing.

*In re Polar Bear*, 794 F. Supp. 2d at 79 (citations omitted).

The District Court held another hearing on February 23, 2011, after which it granted summary judgment in favor of FWS. The District Court rejected all of the challenges to the Listing Rule. *See generally id.* After a lengthy review of Appellants' arguments, the District Court concluded that it was "simply not persuaded that [FWS's] decision to list the

polar bear as a threatened species under the ESA was arbitrary and capricious." *Id.* at 81. Appellants challenge this decision and several conservation groups have intervened on behalf of FWS.

## II. Analysis

Appellants' principal claim on appeal is that FWS misapplied the statutory criteria for a listing decision by ignoring or misinterpreting the record before it and failing to articulate the grounds for its decision. In particular, Appellants contend that: (1) FWS failed to adequately explain each step in its decisionmaking process, particularly in linking habitat loss to a risk of future extinction; (2) FWS erred by issuing a single, range-wide determination; (3) FWS relied on defective population models; (4) FWS misapplied the term "likely" when it determined that the species was likely to become endangered; (5) FWS erred in selecting a period of 45 years as the "foreseeable future"; (6) FWS failed to "take into account" Canada's polar bear conservation efforts; and (7) FWS violated Section 4(i) of the ESA by failing to give an adequate response to the comments submitted by the State of Alaska regarding the listing decision. For the reasons discussed below, we find these arguments meritless.

## A. Standard of Review

We will uphold an agency action unless we find it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard applies to our review of ESA listing decisions. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008). Under the arbitrary and capricious standard, the reviewing court determines whether the agency "considered

the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009). "The Supreme Court has explained that an agency acts arbitrarily or capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Am. Wildlands*, 530 F.3d at 997-98 (quoting *State Farm*, 463 U.S. at 43). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Deference is especially warranted where the decision at issue "requires a high level of technical expertise." *Marsh*, 490 U.S. at 377. "In a case like the instant one, in which the District Court reviewed an agency action under the APA, we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002).

**B.  The Agency's Decision**

The Listing Rule rests on a three-part thesis: the polar bear is dependent upon sea ice for its survival; sea ice is declining; and climatic changes have and will continue to dramatically reduce the extent and quality of Arctic sea ice to a degree sufficiently grave to jeopardize polar bear populations. *See* Listing Rule, 73 Fed. Reg. at 28,212. No part of this thesis is disputed and we find that FWS's conclusion – that the polar bear is threatened within the meaning of the ESA – is reasonable and adequately supported by the record.

The Listing Rule is the product of FWS's careful and comprehensive study and analysis. Its scientific conclusions are amply supported by data and well within the mainstream on climate science and polar bear biology. Thirteen of the fourteen peer reviewers to whom FWS submitted the proposed rule found that it generally "represented a thorough, clear, and balanced review of the best scientific information available from both published and unpublished sources of the current status of polar bears" and that it "justified the conclusion that polar bears face threats throughout their range." Listing Rule, 73 Fed. Reg. at 28,235. Only one peer reviewer dissented, "express[ing] concern that the proposed rule was flawed, biased, and incomplete, that it would do nothing to address the underlying issues associated with global warming, and that a listing would be detrimental to the Inuit of the Arctic." *Id.*

As we discuss below, several of Appellants' challenges rely on portions of the record taken out of context and blatantly ignore FWS's published explanations. Others, as the District Court correctly explained, "amount to nothing more than competing views about policy and science," on which we defer to the agency. *In re Polar Bear*, 794 F. Supp. 2d at 69; *see also Am. Wildlands*, 530 F.3d at 1000 (reviewing courts must "avoid[] all temptation to direct the agency in a choice between rational alternatives").

Significantly, Appellants point to no scientific findings or studies that FWS failed to consider in promulgating the Listing Rule. At oral argument, Appellants' counsel acknowledged that Appellants do not claim that FWS failed to use the "best scientific and commercial data available" as required by 16 U.S.C. § 1533(b)(1)(A). *See* Oral Argument at 25:22. Rather, "Appellants merely disagree with the implications of the data for the species' continued viability." Br. of Appellees at 14.

Where, as here, the foundational premises on which the agency relies are adequately explained and uncontested, scientific experts (by a wide majority) support the agency's conclusion, and Appellants do not point to any scientific evidence that the agency failed to consider, we are bound to uphold the agency's determination. Therefore we affirm the District Court's decision to uphold the Listing Rule.

We now address in turn each of Appellants' seven principal claims that the Listing Rule is arbitrary and capricious.

### 1. *Adequacy of FWS's Explanation*

Appellants argue that FWS violated the APA and ESA by inadequately explaining how the predicted decrease in habitat would likely lead to such a dramatic population decline causing the species to be endangered within the next 45 years. *See, e.g.*, *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008) (holding that agency failed to justify its rulemaking with "a discernible path [of reasoning] to which the court may defer"). In particular, Appellants contend that FWS did not explain how the projected habitat loss would put the polar bear "in danger of extinction" in the foreseeable future or how great a decrease in the current population would constitute endangerment. Appellants rely on *Defenders of Wildlife v. Norton*, which held that "the loss of a predetermined percentage of habitat or range would [not] necessarily qualify a species for listing," in part because "[a] species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat." 258 F.3d 1136, 1143 (9th Cir. 2001). Therefore, "the percentage of habitat loss that will render a species in danger of extinction or threatened with extinction will necessarily be determined on a case by case basis." *Id.*

Appellants' claim fails because FWS clearly explained how the anticipated habitat loss renders this particular species likely to become endangered. The agency considered and explained how the loss of sea ice harms the polar bear. *See, e.g.*, Listing Rule, 73 Fed. Reg. at 28,275 (as a result of ice loss, "polar bears will face increased competition for limited food resources, increased open water swimming with increased risk of drowning, increasing interaction with humans with negative consequences, and declining numbers that may be unable to sustain ongoing harvests"). The agency also considered the observed demographic trends in the areas where habitat loss has been most severe. For example, the Western Hudson Bay population – which "occurs near the southern limit of the species' range" in an area without year-round sea ice – has been in decline. *Id.* at 28,267. Numerous experts predict that the sea ice loss in that area will soon weaken female polar bears to the point where reproduction levels become negligible. *Id.* at 28,266-67. And climatologists anticipate that climatic changes will eventually affect all Arctic sea ice, causing FWS to predict "reduced numbers and reduced distributions of polar bears range-wide." *Id.* at 28,276.

The agency's decision was thus nothing like the situation described in *Defenders of Wildlife*. Here the agency carefully and clearly explained how this particular habitat loss leaves this particular species likely to become endangered. The Listing Rule not only provides "a discernible path" of decisionmaking to which we must defer, *Am. Radio*, 524 F.3d at 241, but it also firmly "articulate[s] a rational connection between the facts found and the choice made." *Keating*, 569 F.3d at 433.

### 2. *Species' Status Range-wide*

Two of the Joint Appellants also argue that even if certain polar bear populations are threatened, FWS was wrong

to conclude that the species is threatened throughout its range. They point to the agency's description of the Archipelago and Convergent ecoregions, both of which, FWS notes, are somewhat insulated from seasonal melting by various geophysical features. The ice in the far-northern Archipelago ecoregion is protected by "the buffering effects of the island archipelago complex, which lessens effects of oceanic currents and seasonal retractions of ice and retains a higher proportion of heavy more stable, multi-year sea ice." Listing Rule, 73 Fed. Reg. at 28,276. The Convergent ecoregion, because of generalized ice drift, "accumulates ice . . . as it is moved from the polar basin Divergent Ecoregion." *Id.* at 28,218. As a result, this area "is characterized by heavy multi-year ice." *Id.* Consequently, polar bear populations in both regions are not forecasted to decline as precipitously as those in the two more vulnerable ecoregions. *Id.* at 28,248. Appellants seize on these projections to argue that the agency overreached by listing the entire species.

The agency considered comments along those lines and provided an adequate response. *See, e.g.*, *id.* at 28,240-41. FWS acknowledged that receding sea ice may affect some polar bear populations later than others. *Id.* However, the agency also explained that much of this region is

> limited . . . in its ability to sustain a large number of polar bears because: (1) changes in the extent of ice and precipitation patterns are already occurring in the region; (2) the area is characterized by lower prey productivity (e.g., lower seal densities); and (3) polar bears moving into this area would increase competition among bears and ultimately affect polar bear survival. In addition, a small, higher-density population of polar bears in the Canadian Arctic would be subject to increased vulnerability to perturbations such as disease or accidental oil discharge from vessels.

19

*Id.*

Moreover, FWS explained that "accepted climate models" predict sea ice loss throughout the Arctic and anticipate that all polar bear populations will be affected. *Id.* at 28,248-49. The undisputed record indicates that sea ice is declining and is projected to continue declining throughout the range, and the projected decline includes the Archipelago and Convergent ecoregions. *See id.* at 28,240-41, 28,248-49, 28,271, 28,275-76. In 2007, sea ice losses in the Archipelago and Convergent ecoregions were unprecedented. *See id.* at 28,220-21, 28,271, 28,276. "Arctic sea ice receded so much in 2007 that the so-called 'Northwest Passage' through the straits of the Canadian Arctic Archipelago completely opened for the first time in recorded history." *Id.* at 28,220. FWS found that, as a result of such developments, Arctic sea ice declines were outstripping climate model projections. *See id.* at 28,220, 28,271, 28,276. FWS explained that the 2007 record sea ice declines "are an extension of an accelerating trend of minimum sea ice conditions and further support the concern that current sea ice models may be conservative and underestimate the rate and level of change expected in the future." *Id.* at 28,276.

The Listing Rule also indicates that, "[a]lthough climate change may improve conditions for polar bears in some high latitude areas where harsh conditions currently prevail, these improvements will only be transitory. Continued warming will lead to reduced numbers and reduced distribution of polar bears range-wide." *Id.* Relying on projections regarding sea ice declines, FWS concluded that "the most northerly polar bear populations will experience declines in demographic parameters similar to those observed in the Western Hudson Bay population, along with changes in distribution and other currently unknown ecological responses." *Id.* In light of this record, FWS determined that, "ultimately, all polar bear

populations will be affected within the foreseeable future, and the species will likely become in danger of extinction throughout all of its range." *Id.* The best available science suggests that some polar bear populations will remain at mid-century; however, this does not undermine FWS's decision to list the species as threatened, but rather supports the agency's decision *not* to list it as endangered.

Appellants further argue that FWS should have divided the species into Distinct Population Segments for the purposes of this listing decision. *See* 16 U.S.C. § 1532(16) ("species" includes "any distinct population segment of any species"). In assessing polar bear populations, FWS applied its Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722 (Feb. 7, 1996). Appellants do not challenge this policy. Instead, they merely argue that FWS misapplied it in this case. Appellants carry a heavy burden in advancing this claim because the agency's interpretation of its own regulations "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The DPS Policy establishes three criteria for a Distinct Population Segment, which the agency must assess sequentially:

> (1) Discreteness of the population segment in relation to the remainder of the species to which it belongs;

> (2) The significance of the population segment to the species to which it belongs; and

> (3) The population segment's conservation status in relation to the Act's standards for listing (i.e., is the

population segment, when treated as if it were a species, endangered or threatened?).

DPS Policy, 61 Fed. Reg. at 4725. "Discreteness" requires that the population segment be either "markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors" or "delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant." *Id.* FWS considered whether any of the nineteen polar bear populations or four ecoregions satisfied the terms of the DPS Policy and concluded that they did not.

In addressing the "markedly separated" criterion, Appellants point to parts of the record that discuss some differences between the relevant populations and ecoregions in an effort to show that they are legally discrete. As FWS explained, however,

> there are no morphological or physiological differences across the range of the species that may indicate adaptations to environmental variations. Although polar bears within different populations or ecoregions . . . may have minor differences in demographic parameters, behavior, or life history strategies, in general polar bears have a similar dependence upon sea ice habitats, rely upon similar prey, and exhibit similar life history characteristics throughout their range.

Listing Rule, 73 Fed. Reg. at 28,294.

FWS also found only "small genetic differences" among polar bears in different areas, indicating "extensive population mixing associated with large home ranges and movement patterns." *Id*. Comment 51 in the Listing Rule asserts that "[t]he 19 populations [FWS] has identified cannot be thought

of as discrete or stationary geographic units, and polar bears should be considered as one Arctic population." *Id*. at 28,248. In response, FWS stated:

> We agree that the boundaries of the 19 populations are not static or stationary. Intensive scientific study of movement patterns and genetic analysis reinforces boundaries of some populations while confirming that overlap and mixing occur among others. Neither movement nor genetic information is intended to mean that the boundaries are absolute or stationary geographic units; instead, they most accurately represent discrete functional management units based on generalized patterns of use.

*Id.* The bottom line is that the Listing Rule reasonably concludes that physiology, demographics, behavior, and life history strategies of the species are "not sufficient to distinguish population segments under the DPS Policy." *Id*. at 28,294.

Appellants also argue that the "international governmental boundaries" criterion is satisfied because the polar bear's range encompasses several Arctic countries with distinct management programs. Here too, the agency offered a reasonable explanation that refutes Appellants' contention:

> Given that the threats to the polar bear's sea ice habitat is [sic] global in scale and not limited to the confines of a single country, and that populations are being managed collectively by the range countries (through bi-lateral and multilateral agreements), we do not find that differences in conservation status or management for polar bears across the range countries is sufficient to justify the use of international boundaries to satisfy the discreteness criterion of the DPS Policy.

*Id.*

While Appellants may disagree with FWS's decision, there is nothing in the record to suggest that the agency's decision to make a single, range-wide listing determination was "plainly erroneous or inconsistent with" the DPS Policy. *Thomas Jefferson Univ.*, 512 U.S. at 512. Therefore, we reject this challenge and hold that FWS's conclusion that the species warranted listing throughout its range was not arbitrary and capricious.

### 3. *The USGS Population Models*

Appellants additionally challenge FWS's reliance on two polar bear population models developed by USGS. USGS submitted nine scientific reports to assist FWS in developing the Listing Rule. One of these reports presented two models of projected polar bear population trends. *See* STEVEN C. AMSTRUP ET AL., FORECASTING THE RANGE-WIDE STATUS OF POLAR BEARS AT SELECTED TIMES IN THE 21ST CENTURY ("AMSTRUP REPORT") (2007). One model was "a deterministic Carrying Capacity Model (CM) that applied current polar bear densities to future . . . sea ice projections to estimate potential future numbers of polar bears in each of the 4 ecoregions." Listing Rule, 73 Fed. Reg. at 28,272. The other was "a Bayesian Network Model (BM), [which] included the same annual measure of sea ice area as well as measures of the spatial and temporal availability of sea ice. In addition, the BM incorporated numerous other stressors that might affect polar bear populations that were not incorporated in the carrying capacity model." *Id.*

Citing these models' limitations, Appellants argue that FWS erred in relying on them. Appellants' chief criticism of the CM is its assumption that polar bear density will remain constant over time, which USGS itself conceded was "almost certainly not valid." AMSTRUP REPORT at 12. Appellants

argue that the BM was also unreliable, pointing to FWS's own characterization of the BM "as an 'alpha' level prototype that would benefit from additional development and refinement." Listing Rule, 73 Fed. Reg. at 28,274.

"While courts routinely defer to agency modeling of complex phenomena," the agency must "explain[] the assumptions and methodology used in preparing the model and provide[] a complete analytic defense should the model be challenged." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1053-54 (D.C. Cir. 2001) (per curiam); *see also Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) ("If . . . the model is challenged, the agency must provide a full analytical defense."). Appellants contend that FWS has not done so here. This argument is plainly meritless.

"That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it." *Appalachian Power*, 249 F.3d at 1052. FWS explained the methodology of the models within the Listing Rule itself, *see* 73 Fed. Reg. at 28,272-75, and FWS made available the full Amstrup Report for public comment before the final rule was promulgated, *see id.* at 28,235. The Listing Rule acknowledges the limitations of these two models and repeatedly explains that the agency only used them for the limited purpose of confirming "the general direction and magnitude" of the population trends already forecast on the basis of other record evidence. *Id.* at 28,276. This is wholly unlike *Appalachian Power* and *Columbia Falls*, where the agency failed to explain how those models' shortcomings did not undercut the challenged rules. *See Appalachian Power*, 249 F.3d at 1053; *Columbia Falls*, 139 F.3d at 923.

It is also noteworthy that Appellants' stance on these models is self-contradictory. Despite challenging the models' reliability, elsewhere in their briefs Appellants highlight

USGS's criticism that FWS did *not rely on the models enough*. *See* Appellants' Joint Br. at 21. Ironically, Appellants cite to a USGS statement that says: "[w]hat we found to be missing is a clear linkage between the [models'] forecasted decline and the finding." *Id.* (quoting General and Technical Comments from USGS on the Draft Final Rule (Aug. 13, 2007)). In offering this citation, however, Appellants tellingly omit USGS's conclusion that

> the outcomes from the [BM] are that polar bear populations living in the Seasonal and Divergent ecoregions are most likely extinct within the foreseeable future.

General and Technical Comments from USGS on the Draft Final Rule (Aug. 13, 2007). In other words, USGS was of the view that the disputed models supported a stronger position than FWS was prepared to take. Appellants' claim, that FWS blindly embraced the models and ignored their limitations, is clearly false.

We hold that FWS's narrow reliance on the USGS population models was not arbitrary and capricious. FWS understood and explained the models' limitations and carefully explained why its limited reliance on the models was justified. As noted above, FWS only used the USGS population models for the limited purpose of confirming "the general direction and magnitude" of the population trends already forecast on the basis of other record evidence. Listing Rule, 73 Fed. Reg. at 28,276. In other words, it is absolutely clear that the models were not central to FWS's listing decision.

### 4. *FWS's Standard of Likelihood*

Appellants further claim that FWS imported into the ESA's listing standard, and then failed to apply, the IPCC's

definition of "likely." The Act defines a threatened species as "any species which is *likely* to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20) (emphasis added). However, the term "likely" is not defined in the Act or by regulation.

The IPCC defines "likely" as 67-to-90 percent certainty. *See* INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE: FOURTH ASSESSMENT, SUMMARY FOR POLICYMAKERS 3 n.6 (2007). Appellants claim that FWS relied on this definition in determining that the polar bear is likely to become an endangered species. In support of this claim, Appellants point to one place in the Listing Rule where FWS referenced the IPCC definition in response to a peer review question. The section to which Appellants point says: "The IPCC [Fourth Assessment Report] assigns specific probability values to terms such as 'unlikely,' 'likely,' and 'very likely.' We have attempted to use those terms in a manner consistent with how they are used in the IPCC [Fourth Assessment Report]." Listing Rule, 73 Fed. Reg. at 28,237. Appellants contend that, based on this limited reference to the IPCC, FWS embraced the IPCC's definition of "likely," then ignored it, failed to apply it to its assessment of the polar bear, and thus issued an arbitrary and capricious decision. We disagree.

When the disputed section is read in context, Appellants' argument is facially implausible. FWS's reference to the IPCC's definition of "likely" seems related only to the agency's confidence in the climate forecasts, not to forecasts on the species' survival. The paragraph above the disputed section is focused on "information on climate observations and projections" and the views of "climate change scientists." *Id.* And the sentence immediately following the disputed reference to the IPCC refers only to climate modeling. *See id.* ("We have taken our best effort to identify the limitations and

uncertainties of the climate models and their projections used in the proposed rule."). Furthermore, Appellants point to nothing else in the Listing Rule to support their claim that FWS relied on the IPCC definition in determining that the polar bear is likely to become an endangered species.

In its brief to this court, FWS reasonably explains that the agency interpreted the statutory reference to "likely" as having its "ordinary meaning" or "dictionary definition." Br. of Appellees at 45-46. FWS essentially argues that there is nothing in the Listing Rule to indicate that the agency bound itself to the IPCC definition and thus meant to conclude that "likely" means 69-to-90 percent certainty. We agree.

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. U.S.*, 444 U.S. 37, 42 (1979). FWS's implicit understanding of "likely" is consistent with the word's ordinary definition. Therefore, we do not accept the claim that FWS meant to apply anything other than the commonplace definition of "likely."

Appellants argue in the alternative that FWS arbitrarily and capriciously failed to apply any standard of "likelihood" at all. This argument also fails. In a rulemaking an agency is free to rely on common English usage without adopting specialized definitions. The agency made a reasoned determination that the species is "likely to become an endangered species within the foreseeable future." 16 U.S.C. § 1532(20). Appellants have not presented us with a single case in which a court has struck down an ESA listing decision because the agency declined to separate out and specially define the term "likely." Nor do we believe that FWS's decision not to expressly define "likely" has impeded our ability to review the agency's decisionmaking process. We hold that the Listing Rule does not misapply the statutory

term "likely," as that term is commonly understood, and that the agency action was not arbitrary and capricious on these grounds.

### 5. *FWS's Standard of Foreseeability*

The Act defines a threatened species as "any species which is likely to become an endangered species within the *foreseeable* future." 16 U.S.C. § 1532(20) (emphasis added). FWS considered the particular circumstances of this listing decision and concluded that 45 years was the appropriate foreseeable time period. *See* Listing Rule, 73 Fed. Reg. at 28,253-55. Appellants argue that FWS failed to justify its definition of "foreseeable" as a 45-year period.

The term "foreseeable" is not defined by statute or regulation. FWS determines what constitutes the "foreseeable" future on a case-by-case basis in each listing decision. *See, e.g.*, 12-Month Finding on a Petition to List the Siskiyou Mountains Salamander (Plethodon stormi) and Scott Bar Salamander (Plethodon asupak) as Threatened or Endangered, 73 Fed. Reg. 4380, 4381 (Jan. 24, 2008) (defining the foreseeable future as 40 years based on FWS's ability to accurately anticipate threats to the species). Appellants apparently reject FWS's case-by-case approach and claim that "'the foreseeable future' is the furthest period of time in which [FWS] can reliably assess, based on predicted conditions, whether the listing factors indicate that the species likely will become 'endangered.'" Appellants' Joint Br. at 44. Appellants cite no legal authority suggesting that FWS was bound to follow their preferred definition. In any event, we conclude that, even applying Appellants' formulation, FWS's definition of foreseeability is reasonable.

FWS explained that "[t]he timeframe over which the best available scientific data allows us to reliably assess the effect of threats on the species is the critical component for

determining the foreseeable future." Listing Rule, 73 Fed. Reg. at 28,253. "In the case of the polar bear, the key threat is loss of sea ice, the species' primary habitat." *Id.* FWS looked at the most widely accepted climate models, as compiled by, among others, the IPCC. It found that there was general agreement in these models about warming and sea ice trends until about mid-century, at which point they diverge on the basis of uncertainties about, *inter alia*, population growth, technological improvements, and regulatory changes. *See id.* (different models' projections are fairly consistent until mid-century "because the state-of-the-art climate models used in [the IPCC's Fourth Assessment Report] have known physics connecting increases in [greenhouse gas concentrations] to temperature increases through radiation processes, and the [greenhouse gas] levels used in the [models'] emissions scenarios follow similar trends until around 2040-2050").

Appellants do not challenge the data underlying FWS's listing decision, but only FWS's interpretation of that data. That Appellants might have chosen a different period of foreseeability is of no moment so long as the agency's decision was justifiable and clearly articulated. Here, we find that FWS has not "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," nor is the agency's explanation "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Am. Wildlands*, 530 F.3d at 997-98 (quoting *State Farm*, 463 U.S. at 43).

Appellants also challenge FWS's discussion of polar bear biology as an alternative justification for the 45-year period of foreseeability. Listing Rule, 73 Fed. Reg. at 28,254. We need offer no opinion on the merits of Appellants' scientific critique because we conclude that the agency's reliance on

climate projections was sufficient to support their definition of foreseeability. *See id.* (explaining that polar bear biological considerations, such as reproductive cycles, were "not relied on as the basis for determining 'foreseeable future,'" even though they provided "greater confidence for this listing determination").

### 6.  *Canada's Polar Bear Conservation Efforts*

The Act directs FWS to make listing decisions "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after *taking into account* those efforts, if any, being made by any State or foreign nation . . . to protect such species." 16 U.S.C. § 1533(b)(1)(A) (emphasis added). Appellants contend that FWS did not properly "take into account" Canada's polar bear conservation practices in determining whether to list the species.

Appellants' argument on this point is internally inconsistent. At times, they construe the agency's obligation to "take into account" foreign conservation efforts as part of its review of the "best scientific and commercial data available." *See* Appellants' Joint Br. at 58. In other words, they argue that foreign conservation efforts must be part of the agency's five factor analysis under 16 U.S.C. § 1533(a)(1). Under this interpretation, successful international conservation efforts could conceivably offset domestic habitat destruction, possibly obviating the need for a listing decision on the basis of 16 U.S.C. § 1533(a)(1)(A).

On this view of the law, FWS clearly satisfied the requirements of Act. The Listing Rule discusses the Canadian harvest and export program at several points. *See, e.g.*, Listing Rule, 73 Fed. Reg. at 28,242. Ultimately, FWS concluded there were no regulatory mechanisms in place, domestic or international, that would "effectively address the primary

threat to polar bears – the rangewide loss of sea ice habitat." *Id.* at 28,288. The Listing Rule's discussion of these conservation efforts and their inability to offset the likely effects of habitat loss is sufficient for us to conclude that FWS "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating*, 569 F.3d at 433.

Appellants also advance a different argument: that the agency has an "independent obligation" to "take into account" foreign conservation efforts in addition to the five factors in 16 U.S.C. § 1533(a)(1). *See* Appellants' Joint Br. at 53. FWS addressed a similar contention in the Listing Rule. Comment 21 suggested that FWS "failed to consider the negative impacts of listing on the long-term management of polar bears developed in Canada that integrates subsistence harvest allocations with a token sport harvest." Listing Rule, Fed. Reg. at 28,242. The agency replied in relevant part as follows:

> Significant benefits to polar bear management in Canada have accrued as a result of the 1994 amendments to the [Marine Mammal Protection Act] that allow U.S. citizens who legally sport-harvest a polar bear from an MMPA-approved population in Canada to bring their trophies back into the United States. These benefits include economic revenues to native hunters and communities; enhanced funding a [sic] support for research; a United States conservation fund derived from permit fees that is used primarily on the Chukchi Sea population; and increased local support of scientifically-based conservation programs. . . . [However] the Service must list a species when the best scientific and commercial information available shows that the species meets the definition of endangered or threatened. The effect of the listing, in this case an end to the import provision under Section 104(c)(5) of the MMPA, is not one of the listing

factors. *Furthermore, the benefits accrued to the species through the import program do not offset or reduce the overall threat to polar bears from loss of sea ice habitat.*

*Id.* (emphasis added). Whether or not FWS was required to consider the negative impacts of its listing decision on Canadian conservation efforts, the final sentence of the above-quoted text indicates that it in fact did so. It concluded that the benefits that accrued to polar bears from continued importation of polar bear trophies from Canada were not sufficient to undermine the basis for the listing decision. This answer was enough, on its own, to dispose of the objection raised.

### 7. *Written Justification to the State of Alaska*

The State of Alaska separately argues that FWS failed to comply with Section 4(i) of the Act, which requires the agency to provide a state with "a written justification for [its] failure to adopt regulations consistent with the [state's] comments or petition." 16 U.S.C. § 1533(i). Alaska submitted detailed comments in response to both the proposed rule and the nine USGS reports. On June 17, 2008, FWS responded with a 45-page letter to Alaska specifically addressing the State's concerns. Alaska now maintains that this was insufficient "written justification" for the agency action.

As a threshold matter, we reject FWS's argument that Alaska's claim under Section 4(i) is not subject to judicial review as part of the agency action. Like the District Court, we construe Section 4(i) as "a procedural step that becomes reviewable upon review of the final agency action (here, the Listing Rule)." *In re Polar Bear*, 794 F. Supp. 2d at 115 n.59.

We further agree with the District Court that FWS satisfied its obligations under Section 4(i) and that Alaska's claim plainly lacks merit. Alaska acknowledges that the

written justification that it received from FWS was timely, but asserts that its content was inadequate. The Act does not indicate what the substance of a written justification must be. We find, however, that under any reasonable reading of the Act, FWS committed no error in its response to the concerns raised by the State of Alaska.

The agency regulations state that:

> If a State agency, given notice of a proposed rule . . . submits comments disagreeing in whole or in part with a proposed rule, and the Secretary issues a final rule that is in conflict with such comments, or if the Secretary fails to adopt a regulation for which a State agency has made a petition . . . the Secretary shall provide such agency with a written justification for the failure to adopt a rule consistent with the agency's comments or petition.

50 C.F.R. § 424.18(c). When this regulation was promulgated, FWS and the National Oceanic and Atmospheric Administration – the two agencies that jointly administer the Act – offered the following interpretation to amplify the statutory requirement:

> [A commenter] recommended that any justification provided a State agency under § 424.18(c) be required to, ". . . set forth the reasons that the State agency's position was rejected, in sufficient detail and with sufficient supporting data, that the agency may have an evidentiary basis for comparing its position with that of the Secretary." The Services do not believe that Congress intended to establish such a strict standard for justifications to State agencies. Rather, the Services interpret this provision of the Act to provide that State agencies be adequately informed of the basis

for any action that is not in agreement with that agency's recommendation.

Amended Procedures to Comply with the 1982 Amendments to the Endangered Species Act, 49 Fed. Reg. 38,900, 38,906 (Oct. 1, 1984).

The Services' interpretation of the applicable regulation commands no deference from this court. As the Supreme Court has said, "[s]imply put, the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute. An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). In other words, *Gonzales* indicates that an agency's *interpretation of a regulation* commands no deference under *Auer v. Robbins*, 519 U.S. 452, 462 (1997), or *Thomas Jefferson University*, 512 U.S. at 512, if the regulation merely parrots the statute and the interpretation does not itself carry the force of law warranting deference. *See Gonzales*, 546 U.S. at 255-56 (holding that "deference . . . is warranted only when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," and discussing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), and *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984)). An agency interpretation that commands no deference "is 'entitled to respect' only to the extent it has the 'power to persuade'." *Gonzales*, 546 U.S. at 256 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

We find that FWS's interpretation of Section 4(i) was eminently reasonable and, thus, "entitled to respect."

*Skidmore*, 323 U.S. at 140. FWS's 45-page reply letter to Alaska shows that "the Agency clearly thought about the [State's] objections and provided reasoned replies – all the APA requires." *City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007).

In its brief to this court, Alaska argues that FWS's written justification was deficient because the State disagreed with the federal agency's disposition of several substantive issues in the Listing Rule. FWS's letter to Alaska amplified the basis for its positions on the disputed issues and, thus, effectively addressed Alaska's comments. Alaska does not argue that FWS failed to give a timely response to the State's comments. Rather, Alaska simply disagrees with the substantive content of FWS's response. *See, e.g.*, Alaska's Separate Br. at 12. ("[FWS] failed to adequately address these concerns."); *id.* at 13 ("[FWS] failed to adequately respond. . . ."); *id.* ("[FWS] failed to provide the 'adequate written justification. . . .'").

In requiring FWS to "submit to the State . . . a written justification for [its] failure to adopt regulations consistent with the [State's] comments or petition," Section 4(i) does not mean to ensure that the State will be satisfied with FWS's response. Rather, Section 4(i) obviously is designed to allow states to advance their particular sovereign concerns to ensure that the federal agency has fully considered the applicable state interests. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 519-20 (2007). FWS's lengthy response to Alaska makes it clear that the federal agency was fully aware of the State's interests and concerns and addressed them. That is all the Act required. Indeed, even Alaska acknowledges that Section 4(i) is a "procedural" rule, nothing more. *See* Alaska's Separate Br. at 20. Thus, in assessing whether FWS satisfied the procedural requirements of Section 4(i), we do not analyze the sufficiency of FWS's responses to Alaska's comments. *Cf.*

*City of Portland*, 507 F.3d at 714. Any challenges that Alaska has to the substantive Listing Rule can be – and, indeed, were – made in a challenge to the Listing Rule itself.

In sum, we hold that FWS plainly satisfied its duties under Section 4(i) in responding to the State of Alaska. We therefore affirm the judgment of the District Court on this point.

## III. Conclusion

For the reasons discussed above, we affirm the judgment of the District Court.